IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND
CIVIL SYSTEM


DAMOND T. DURANT JR.,

     Plaintiff,

                              Case No.:  24 C 15 000246

  vs.

DAMOND T. DURANT SR.,

     Defendant.
_____/


OFFICIAL TRANSCRIPT OF PROCEEDINGS
(Motion to Enter Final Judgment)


                       Baltimore, Maryland

                       Wednesday, February 17, 2016


BEFORE:

     HONORABLE JEFFREY M. GELLER, ASSOCIATE JUDGE


APPEARANCES:

     For the Plaintiff:

         JOHN A. BOURGEOIS, ESQUIRE
         JUSTIN A. REDD, ESQUIRE

     For the Defendant:

         No appearance on behalf of Defendant


Electronic Proceedings Transcribed by:  Lisa Beck

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

C O N T E N T S

|                          |       | PAGE |
|--------------------------|-------|------|
| RECORD OF PROCEEDINGS     |       | H-3  |

T E S T I M O N Y

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

For the Plaintiff:

| Damond Durant Jr. | H-12 | | | |

E X H I B I T S

| NO. | DESCRIPTION | ID. | EVID. |
|-----|-------------|-----|-------|

For the Plaintiff:

| 1 | Baltimore City mayor's office 2004 public record re employee salary for Officer Damond Durant Sr. | H-25 | H-26 |
| 2 | Baltimore City mayor's office 2015 public record re employee salary for Officer Damond Durant Sr. | H-25 | H-26 |

A R G U M E N T

| BY MR. BOURGEOIS | H-26 |
|------------------|------|

C O U R T ' S   R U L I N G S

| DESCRIPTION | PAGE |
|-------------|------|
| Court to vacate prior judgment that was entered to replace with final judgment as of date of this hearing | H-40 |

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

C O N T E N T S, cont'd

C O U R T ' S   R U L I N G S, cont'd

| DESCRIPTION | | PAGE |
|---|---|---|
| Damages to be awarded to Plaintiff as follows: | | |
| Compensatory damages | $ 75,804.83 | H-40 |
| Non-economic damages | 70,000.00 | H-40 |
| Punitive damages | 227,414.49 | H-40 |
| TOTAL JUDGMENT: | $373,219.32 | H-41 |
| Prejudgment interest | 36,014.11 | H-41 |
| Post-judgment interest - to be calculated at legal rate | | H-41 |

-oOo-

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

02/17/16   H-4

1                   P R O C E E D I N G S

2                      (9:35 a.m.)

3          THE CLERK:  Circuit Court for Baltimore City, Part

4     10, the morning session with the Honorable Judge Jeffrey M.

5     Geller presiding.

6          THE COURT:  Good morning.

7          (A chorus of good morning.)

8          THE COURT:  Have a seat, please.  Just bear with

9     me a moment.

10          (Pause.)

11          THE COURT:  All right.  Calling for the record of

12     the matter of Durant v. Durant, 24C 15 246.  Counsel for the

13     record?

14          MR. BOURGEOIS:  Good morning, Your Honor.  John

15     Bourgeois, representing Mr. Durant, Jr.  With me is my

16     colleague, Justin Redd, and Mr. Durant Jr. is to my left.

17          THE COURT:  Good morning all.

18          I know my chambers called your office yesterday

19     because Judge Handy had denied the motion to withdraw.

20          MR. BOURGEOIS:  I think we can address that if I

21     can be heard briefly.

22          THE COURT:  Sure.

23          MR. BOURGEOIS:  To be clear, my firm -- and I want

24     to speak without revealing attorney/client discussions.  But

25     I've talked a bit with Mr. Durant who I've known for years.

02/17/16    H-5

1    Mr. Durant is the grandson of my former secretary who died a

2    few years back and left a legacy to the young Mr. Durant.

3         My firm has had a long relationship with Janice

4    Montgomery, his grandmother.  And I've known Damond since he

5    was shorter than this table.

6         Damond has some diagnosed issues.  And my firm is

7    handling this matter on a pro bono basis and is prepared and

8    would like to continue to do so.  There was a matter that

9    came up between Mr. Durant and me outside the scope of our

10   engagement.  And I will characterize it as there are certain

11   companies out there that will approach people with judgments

12   and offer to pay them money now.  I've explained -- again,

13   it's outside the scope of the representation --

14        THE COURT:  Right.

15        MR. BOURGEOIS:  -- so I'm not revealing anything

16   that's privileged, is that we declined to represent him in

17   connection with that and strongly advised him to stay away

18   from those companies as sharks.

19        Damond was not happy with that for understandable

20   reasons.  He's destitute and been put in a very bad

21   position.  He had talked to some other lawyer who had

22   suggested that we did not have his interests in heart, among

23   other reasons, because we had not instituted foreclo --

24   garnishment proceedings.  We had explained to Mr. Durant

25   that garnishment is not available until there's a final

02/17/16    H-6

1    judgment.

2          We obviously are bound by the Rules of

3    Professional Conduct 1.2(c) to follow the directions of our

4    client.  If our client wants to terminate us, that's his

5    choice.  I understand Judge Handy's ruling and Rule 1.16

6    suggests that there are circumstances under the Rules of

7    Professional Conduct where the Court can overrule a decision

8    to withdraw.  I think that rule is not really applicable.  I

9    think that generally applies when a lawyer is not getting

10   paid and asks to get out.

11         THE COURT:  Uh-huh.

12         MR. BOURGEOIS:  And I don't know that that rule

13   applies to the situation at hand where a client asks to

14   terminate the lawyer.

15         At any rate, I've spoken with Mr. Durant and I

16   understand, but I guess I'd like you to ask him and have him

17   confirm it on the record, that he would like us to proceed

18   today for purposes of finalizing a judgment.

19         THE COURT:  Okay.

20         MR. BOURGEOIS:  So --

21         THE COURT:  Mr. Durant --

22         MR. BOURGEOIS:  Please stand.

23         THE COURT:  -- is that correct?

24         THE PLAINTIFF:  Yes, Your Honor.

25         THE COURT:  You'd like to keep your lawyers --

02/17/16   H-7

```
 1              THE PLAINTIFF:  Yes, Your Honor.
 2              THE COURT:  -- in place for today --
 3              THE PLAINTIFF:  Yes, sir.
 4              THE COURT:  -- to take care of this matter?  Okay.
 5              MR. BOURGEOIS:  Okay.  Thank you, Judge.
 6              THE COURT:  All right.  Well, it's only
 7    coincidence that I happened to be handling the non-hearing
 8    motions docket so I was the person who signed in January the
 9    order and the judgment on the compensatory damages and
10    setting the matter for today.  So when Assignment called me
11    and said that I had this matter, the name sounded awfully
12    familiar and then I got the file and I remembered.
13              MR. BOURGEOIS:  Yeah.
14              THE COURT:  So -- whenever you're ready.
15              MR. BOURGEOIS:  Thank you, Your Honor.  I'd just
16    like to start briefly.
17              As you are aware, having been earlier involved, we
18    have proceeded on a case setting forth four causes of
19    action.  Count I is for fraud/intentional theft; count II is
20    for breach of fiduciary duty; count III is for conversion;
21    and count IV is for unjust enrichment.
22              The defendant, Damond Durant Sr., was served.  Has
23    not responded in any form or fashion to any of the process
24    that he's received.  And the Court -- well, the clerk of the
25    court originally entered an order of default and then Your
```

02/17/16   H-8

1    Honor, upon our application, approved compensatory injury,

2    entered a judgment for compensatory damages in an amount, I

3    believe, of approximately $75,834.  And I would submit that

4    we do not have a final judgment yet.

5         And so, we would propose to present three issues

6    for the Court today to finalize a judgment to get the full

7    panoply of relief that we seek.

8         One is to amend the compensatory damage award to

9    calculate for the Court's benefit prejudgment interest up

10   through today presuming that a final order will be entered

11   today whatever the per diem rate is or after, if it's not

12   entered today.

13        Second, to address non-economic damages in the

14   form of emotional distress and the like.

15        And thirdly, to present evidence and argument on

16   the issue of punitive damages.  In that regard, we would

17   anticipate calling one witness.  We suspect the testimony

18   will be very brief.  It will be from Mr. Durant Jr.

19        Not yet.

20        So, to be clear, although we don't have opposing

21   counsel, we're not going to drive a truck through this.

22   We'd like the Court to enter an appropriate judgment if the

23   Court is inclined, as the finder of fact, to enter an award

24   of non-economic and punitive damages.

25        With respect to punitive damages, we are not going

1    to proceed on count IV.  The Court entered a monetary

2    judgment presumably with respect to each of the four counts,

3    each to run simultaneously, I presume.  But at any rate, we

4    believe that punitive damages is only appropriately awarded

5    under count III -- I'm sorry -- count I for fraud, count III

6    for conversion.  Breach of fiduciary duty is up in the air

7    under <u>Kann v. Kann</u>.  There's no standalone necessarily tort

8    that carries punitive damages.  One has to look at the

9    nature of the duties, the nature of the action.

10           This is a suit against Mr. Durant Sr. in his role

11   as a custodian under the Maryland Uniform Transfer to Minors

12   Act.  And the closest add-on we get to that is the common

13   law of trusteeship which is a creation of equity.  And under

14   Congress (indiscernible - 4:42:47) another law.  There would

15   appear to be no right to punitive damages in equity.  So

16   we're not going to ask the Court to add a further gloss on

17   the law of fiduciary duty just 'cause it's unclear.  We just

18   want to concede as simply as possible.

19           So we're going to ask the Court to consider the

20   punitive damage award with respect to counts I and III,

21   which is fraud and, most specifically, conversion.  And with

22   respect to conversion, we would cite the Court to the case

23   <u>Darcars v. Voorish</u> (sic) and -- <u>Borzym</u> -- I'm sorry.  And

24   that's 379 Md. 249 (2004) -- principally for two

25   propositions.  I know I'm doing this backwards, Your Honor.

02/17/16   H-10

1    I should argue this but I just want to give the Court some

2    background, legal background.

3          In that 2004 case, the Court of Appeals held quite

4    clearly in a conversion action that punitive damages are

5    available providing one meets the standard of proof.

6    Interestingly, the Court in that case also said that the

7    actual malice standard, knowledge of wrongful conduct, is

8    sufficient and can be inferred from the acts themselves.

9    Using the word "inferred malice" is tricky because there is

10   an earlier document on inferred actual malice which has been

11   rejected generally saying simply because somebody breaches a

12   fiduciary duty or engages in fraud, that's not enough.  The

13   Eliron (phonetic) case says, for example, fraud can

14   committed two ways, one by actual knowledge of a false

15   statement and the other is reckless disregard for the truth.

16   Reckless disregard for the truth is not enough.

17         So at any rate, in the conversion case, in

18   Darcars, the Court says you can look at the acts surrounding

19   it and infer a state of mind sufficient for to establish

20   actual malice in the legal sense.

21         And the second point I want to draw the Court's

22   attention to with respect to Darcars is the standard for

23   punitive damages, whether we have an affirmative duty to

24   prove, as part of an entitlement, the defendant's ability to

25   pay (indiscernible - 4:45:16) the financial ability.  And

02/17/16    H-11

1    the Court said no.  That's not part of our burden.  That's

2    some -- it's a fact that the Court can look to, especially

3    an appellate court, in evaluating excessiveness.  But it is

4    not the burden of a plaintiff necessarily to establish an

5    ability to pay but one is guided by the proportionality to

6    compensatory damages and the like.

7            So with that framework, we'd like to proceed.  And

8    I think we can get out of here pretty quickly.

9            THE COURT:  Okay.

10           MR. REDD:  Thank you, Your Honor.  Call Mr.

11   Durant.

12           THE COURT:  All right.  Mr. Durant, you can step

13   up to the witness stand.

14           THE CLERK:  Please remain standing and raise your

15   right hand.

16   Whereupon,

17                   DAMOND DURANT JR.,

18   a witness produced on behalf of himself, first having been

19   duly sworn according to law, was examined and testified as

20   follows:

21           THE CLERK:  Thank you.  Please have a seat.

22           THE WITNESS:  Thank you.

23           THE CLERK:  Once seated, please speak into the mic

24   and state your name and address for the record.

25           THE WITNESS:  Damond Durant, 424 East 26th Street,

02/17/16    H-12

1    Baltimore, Maryland 21218.

2              THE CLERK:  Thank you.

3                        DIRECT EXAMINATION

4              BY MR. REDD:

5         Q    Good morning, Mr. Durant.

6         A    Good morning, Mr. Redd.

7         Q    Okay.  You just stated your name and where you

8    live.  How old are you?

9         A    Twenty-three.

10        Q    And are you employed?

11        A    No, I'm not currently.

12        Q    Okay.  What's your father's name?

13        A    Damond Durant -- Damond Trammell (phonetic)

14    Durant.

15        Q    Is he senior?

16        A    Senior.  Senior.  Apologize.

17        Q    Okay.  So you're junior?

18        A    Yes, sir.

19        Q    And is your father the defendant in this case?

20        A    Yes, sir.

21        Q    Starting early in your life, what was your

22    relationship with your father?

23        A    I didn't -- I lived with my grandmother until I

24    was 14.  And so, the relationship wasn't there really at all

25    as a father figure.  When she passed away, it was -- I was

02/17/16  H-13

1    apparently going into high school.  So me having the

2    childhood growing up with him, learning like who he was,

3    wasn't there at all, so he basically got me when I was

4    already almost grown, growing up, 14, 15, teenage years.  So

5    we kind of butted heads 'cause we didn't have a relationship

6    at all.

7         Q    You said that happ -- that you started to have a

8    relationship when you were about 14 or 15?

9         A    Yeah.  Well, but -- yes.

10        Q    What happened when you were that age --

11        A    Umm --

12        Q    -- that -- what happened with your grandmother?

13        A    Oh.  She passed away.  And --

14        Q    Okay.  You had lived with her before?

15        A    Yes.

16        Q    Okay.  And so then what happened with your living

17   situation around that time?

18        A    Then I moved with my father after she passed for

19   four years until I graduated high school.

20        Q    Okay.  What does your father -- or what did your

21   father do for a living during that time?

22        A    He was a cop.  Yes.  He was a cop.

23        Q    Okay.  Is he still a cop?

24        A    Yes, sir.

25        Q    Okay.  With what department?

1        A        Baltimore City.

2        Q        Okay.

3        A        Southeast district, I believe.

4        Q        Okay.  And when your grandmother died, did she

5   leave you some money?

6        A        Yes.

7        Q        How did you know that?

8        A        Through (indiscernible - 4:48:37), through her

9   will.

10       Q        Okay.  And how did you find out that your

11   grandmother left you this money?  Did you ever see a check?

12       A        Oh, yes, sir.  I was at the -- I received

13   information of the will.  I believe it was a few days later,

14   four -- maybe a week.  I actually saw my father bring in the

15   check of 76, $75,000.

16       Q        That one check, was it about $67,000, $68,000?

17       A        67, yes.  I apologize.

18       Q        Okay.

19       A        $67,000.

20       Q        All right.  And do you know what happened with

21   that money at that time?

22       A        No, sir.

23       Q        Okay.  Did you ever ask your father about that

24   money?

25       A        Yes, sir, many times.  He said he couldn't touch

```
 1    it.  So I left it alone after that.

 2         Q    Okay.  What did you ask him a little more

 3    specifically?

 4         A    At the time growing up being in high school, I did

 5    -- I wanted a car after I got my license at 15 and 9 months,

 6    that I should, you know, get a car.  But he said he couldn't

 7    touch the money.  And every year after that, I asked if I

 8    could borrow a little bit, at least $1000 to get a start --

 9    starting car.  But he said he couldn't touch it.  So I just

10    left it alone.

11         Q    Okay.  Did he elaborate on why he said he couldn't

12    touch it?

13         A    Those were his exact words.  He didn't state

14    anything further other than he couldn't touch it until I was

15    21.

16         Q    Okay.  But did he tell you that it was your money?

17         A    Yes.

18         Q    Okay.  And during that time when you were in high

19    school and living with your father, did you observe anything

20    about his spending?

21         A    Yes.

22         Q    What did you see?

23         A    After the check was received, he did buy a

24    motorcycle first.  And after that, he started going on trips

25    to Cancun and, like, Puerto Rico.  It was two -- two other
```

02/17/16   H-16

1    trips he took.  And didn't take any of his children or --

2    yeah.  Didn't take me, my little sister or any of the other

3    siblings that I have.

4         Q    Okay.  And the motorcycle -- that wasn't for you,

5    was it?

6         A    No, sir.

7         Q    Who was it for?

8         A    For him.

9         Q    Okay.  Did anybody go with him on these trips?

10        A    His wife.  His current wife.

11        Q    Okay.  Who is not your mother.

12        A    Stepmother.

13        Q    All right.  Okay.  Okay.  So then you graduated

14   from high school, right?

15        A    Yes.

16        Q    What high school?

17        A    Baltimore Polytechnical Institute.

18        Q    Okay.  Was that 2010?

19        A    Yes.

20        Q    Okay.  And what were your plans after you

21   graduated from Poly?

22        A    I wanted to go to college and start my business

23   degree or civil engineering.  I did apply to many colleges.

24   Poly was a college prep school so they definitely helped

25   with all of that.  As far as me getting into college, it was

1  -- it wasn't -- it was a fail.  It didn't happen.  Many

2  reasons.  I honestly believe it was mainly because of the

3  FAFSA form.  It wasn't filled out by my parents.

4        Q    Okay.  Did you say the FAFSA form?

5        A    FAFSA, yes.

6        Q    It stands for free application for federal student

7  aid, is that right?

8        A    Sounds good.

9        Q    Yeah.  And there are portions of that that a

10  parent has to fill out --

11        A    Yes.

12        Q    -- right?  And they have to sign that --

13        A    Yes.

14        Q    -- under oath?  Okay.  But did your father do

15  that?

16        A    No, sir.

17        Q    Did you ask him to?

18        A    Or the stepmother.  Yes.  Both.

19        Q    But they didn't?

20        A    No, sir.

21        Q    Okay.  So even though you didn't get into some of

22  the colleges you applied to like Maryland or Syracuse,

23  right, were the two you were looking at?

24        A    Yes, sir.

25        Q    But you did try to go to community college?

1      A     Training school.  I did go to community college.
2    As far as community college, I ran into financial problems
3    with trying to book semesters and stuff like that.  I didn't
4    want to go to the bank or anything, get a student loan.  I
5    didn't want to be in any more debt.
6           At the time, I do believe he was still saying I
7    couldn't touch it because I wasn't 21.  I was 19 at the
8    time.  So I really couldn't do anything further.
9      Q     Right.  But you were still living with your father
10   and stepmother at that time?
11     A     Yes.
12     Q     All right.  Did you move out --
13     A     Yes.
14     Q     -- at some point?  When was that?
15     A     I moved out at the age of 20.  And I was living
16   with his mother.
17     Q     All right.  And --
18     A     My grandmother's house.
19     Q     So you moved out when you were 20.  What have you
20   been told by your father about when you turned 21?
21     A     Nothing at all, to be honest.  I have no memory of
22   --
23     Q     What about with the money?
24     A     Because we stopped talking because of the money.
25     Q     Okay.  But before, what did he tell you about when

02/17/16    H-19

1    you turned 21 with the money?  He said you couldn't touch it

2    until when?

3         A    Until I was 21.

4         Q    Okay.  So you moved out when you were 20.

5         A    Yes.

6         Q    About to turn 21?

7         A    Yes.

8         Q    All right.  So what -- what were you expecting to

9    happen with the money?

10         A    I was expecting to get the money when I turned 21,

11    yes, sir.

12         Q    All right.

13         A    I don't really know how I was expecting to get it.

14    By check, cash.  I really don't know.  At the time, I was

15    naive to the whole situation.  But --

16         Q    Okay.

17         A    I didn't receive anything at the age of 21.

18         Q    All right.  What did happen on -- when you turned

19    21.  What happened?

20         A    On my 21st birthday, he came to --

21         Q    He is --

22         A    My father.  I'm sorry.  My father came to the

23    house -- my grandmother's house, his mother.  And he came on

24    the brand new motorcycle that he bought a few years back.

25    And he did -- he said happy birthday and he gave me $100.

02/17/16   H-20

1   And I asked him where's the rest of it.  I'm pretty much

2   homeless, trying to survive to eat and things like that.

3   And he told me that I have to do what I had to do 'cause

4   it's gone.  So he laughed at -- there was no more -- no

5   further conversation.  So --

6        Q    Okay.  What did -- what does "do what you have to

7   do" mean?

8        A    To him, I don't know what it meant.  To me, it

9   meant that I had to find a way to -- well, have to sue him,

10  basically.

11       Q    Okay.  How did you feel when that happened?

12       A    It was hurtful.  Me being the kind of person I am,

13  I don't let anything really get me out of my character in

14  that situation at the time.  But after a couple months of

15  being home, I realized that it definitely put -- like, it

16  stopped me from doing a lot of things that I should have

17  been doing.

18       Q    Like what?

19       A    College.  Starting my own business that I want.

20  Even the small things like driving and stuff that, you know,

21  I should have been doing.  So --

22       Q    Okay.  Let's back up just a little bit.  You said

23  that you were homeless.  But how did you get from living

24  with your father's mother to your 21st birthday and you had

25  that conversation with your father to then becoming

02/17/16   H-21

1    homeless?  What happened with you?  You know, 'cause you

2    said you don't let stuff get you down.  But what happened

3    between then and that point when you were homeless?  Just

4    describe that a little.

5         A    In my grandma's house, his -- my father's brother

6    also lives with my grandmother.  And he's older.  He's like

7    32.  And we didn't get along because he was a grown man and

8    I was pretty much a grown man in a small townhouse.  And his

9    wife and kids' bed.  My grandmother was really sick.  It was

10   just a lot of drama.  So I really didn't have anything to

11   begin with, so I just, like --

12        Q    Okay.

13        A    And it got to a physical -- a situation with me

14   and his brother, my father's brother.  So I left.

15        Q    Okay.  But for you personally, emotionally, that

16   your father telling you do what you got to do, what effects

17   did that have on you and then how did that -- how did you

18   get from that point to becoming homeless?  Did you have any

19   diagnoses or --

20        A    Yes, sir.  Before -- before -- on my 21st

21   birthday, I can honestly say I didn't really feel like I had

22   any diagnoses.  Like, I was completely mentally sane.  After

23   I left, I was five months homeless living downtown in

24   shelters and on the street and stuff like that.  And after

25   that situation, my mind capacity was not -- it wasn't where

02/17/16    H-22

1    it should be.  I couldn't -- my mental process wasn't as

2    fast as it used to be.  I did hear voices and things like

3    that.  I hate talking about the past.  But it was -- it was

4    true.  And they diagnosed me with paranoid schizophrenia and

5    chronic depression.

6         Q    Okay.  And you mentioned that you were in shelters

7    --

8         A    Yes.

9         Q    -- during that time?

10        A    Yes, sir.

11        Q    And how long of a time were you living in the

12   shelters?

13        A    Specifically, probably two months.  I found the

14   Code Blue Shelter after two months.  But living on the --

15   three months living on the street.  So I was probably in the

16   Code Blue Shelter for about two months.

17        Q    All right.  And so, you were actually homeless for

18   a total of about how long?

19        A    Five months.

20        Q    All right.  And how did you get out of that

21   situation?

22        A    My mother checked me into the hospital.  My

23   grandmother checked me into the hospital.  And after the

24   diagnoses, I started to -- let me see.  I'm sorry.  After

25   the diagnoses, I got on social disability and started to get

02/17/16    H-23

1    back on my feet with the disability check.

2        Q    Okay.  And did you take medications for the

3    diagnosis that you had?

4        A    Yes, sir.

5        Q    And what was your living situation after you got

6    out of the hospital stay?

7        A    Oh.  After I got out of the hospital, I lived in a

8    halfway house.  Assisted living house.  That's what it's

9    called.  Assisted living for about six months, I believe.

10    Six, seven months.

11        Q    So it wasn't actually like a halfway house like

12    when people get out of jail.  It's like a group home?

13        A    Like a group home --

14        Q    Okay.

15        A    -- yes.

16        Q    And you were on the SSI disability?

17        A    It took a -- it took a little while to -- for them

18    to give me the okay that I -- what's it called -- the -- I'm

19    sorry.  I can't think of the word.  But it took a while for

20    it to process and everything.  So I was there for about six,

21    seven months before.  But as soon as I received my first SSI

22    check, I did go find an apartment for myself.

23        Q    All right.  And at some point, did your mother let

24    you know that there was another check from your

25    grandmother's estate?

02/17/16   H-24

1    A    Yes.  She did.

2    Q    When was that about?

3    A    I believe she told me in the process of me being

4    in the hospital.  I don't know if we believed that was the

5    exact period -- time period when she told me.

6    Q    All right.  Had your father ever mentioned a

7    second check?

8    A    Not at all.

9    Q    Okay.

10   A    Not at all.

11   Q    So the first time you heard of it was --

12   A    Yes.

13   Q    -- when you --

14   A    From my mother.

15   Q    -- spoke with your mother.

16   A    Yes, sir.

17   Q    This was in -- about -- you said in the last year,

18   right?  Or --

19   A    Yes, sir.

20   Q    -- year and a half.

21   A    Yes.

22   Q    Okay.  And how are you today?

23   A    My mind capacity and mental process still where

24   they should be.  I'm getting better, though -- though.  I'm

25   starting to get better, though.  And I'm coming along.

1           MR. REDD:  Thank you.

2           THE WITNESS:  Thank you.

3           Thank you, Your Honor.

4           MR. BOURGEOIS:  Your Honor, we just have two

5    exhibits.

6           (Pause.)

7           MR. BOURGEOIS:  This is Hearing Exhibit 1.

8           (Pause.)

9           MR. BOURGEOIS:  And this is Hearing Exhibit 2.

10                    (Whereupon, Hearing Exhibits Nos.

11                     1 and 2 were marked for

12                     identification.)

13          MR. BOURGEOIS:  Your Honor, we would move -- I've

14   handed you what's been marked for identification as Hearing

15   Exhibit 1 and Hearing Exhibit 2.  I know they're hard to

16   see.  But we move them under the public records exception.

17   This is data provided by Baltimore City office of the mayor

18   regarding public employee salaries.  And they set forth

19   Damond Durant Sr.'s total compensation for 2004 at

20   $78,992.17.

21          THE COURT:  I'm trying to read that --

22          MR. BOURGEOIS:  I am, too.  Maybe younger eyes.

23          (Pause.)

24          THE COURT:  78 or 70?

25          MR. BOURGEOIS:  Is it -- can you read that across?

02/17/16   H-26

1    Is that 78 or 70?

2         MR. REDD:  It looks like 70,992.

3         THE COURT:  That's what I thought.

4         MR. BOURGEOIS:  Okay.  I apologize.  My eyes are

5    worse of the three.

6         And then Exhibit 2 is the same data for 2015,

7    fiscal year 2015.  The total compensation, I believe --

8         THE COURT:  81 --

9         MR. BOURGEOIS:  81,108.30.  Those approximate

10   amounts.  And again, I would move those under the public

11   records exception.

12        THE COURT:  All right.  They'll be admitted as

13   Plaintiff's 1 and 2.

14                        (Whereupon, Plaintiff's Exhibits

15                         Nos. 1 and 2 were received in

16                         evidence.)

17        MR. BOURGEOIS:  Okay.  And, Your Honor, that would

18   close our evidence.  You know, and I would just like to

19   briefly argue.

20        THE COURT:  Okay.  Go ahead.

21        MR. BOURGEOIS:  Thank you.

22        Your Honor, this is a case that's truly disturbing

23   in so many ways.  The defendant is not just a father.  He's

24   a city employee.  Supposed to protect and serve.  Not

25   just -- well, to protect and serve the citizens of this

02/17/16   H-27

1     city.  But as a father, he has a role to protect and serve
2     his son and his children.  And he failed miserably in the
3     role as a father.  What we have -- and you've heard briefly
4     from -- is his son, Damond Jr.  And any father, any parent
5     owes an obligation and a duty to protect and serve their
6     children no matter who that child is.

7          But we have a heightened obligation, moral
8     obligation and a legal obligation when it comes to looking
9     after the particularly vulnerable (indiscernible - 5:06:50)
10    in the familial role.  And Damond has done the best he could
11    without virtually any support.  He had a wonderful
12    grandmother who did everything she could for him and, in
13    fact, exceeded and did something that is truly remarkable
14    which is created an estate.  After net of expenses and
15    everything else, she left a sizeable estate for the benefit
16    of Damond and his sister.  Each was to get -- I can't even
17    remember what the net is.  But at any rate, I think each
18    received a net of a third of her estate.  And in Damond's
19    case, that totaled $75,834.83.

20         And she specified in that estate that if he would
21    receive his distribution before the age of 21, it should be
22    held in trust until he turned 21.  So she was not only
23    looking out for him in his will but looking out for his
24    future so he wouldn't squander that money before the age of
25    21.

1           But on top of the familial duties that Officer

2    Durant failed in taking this very vulnerable young man and

3    taking his legacy and taking his mother's -- his

4    grandmother's legacy and squandering it, he violated the

5    law.  He violated the Maryland Uniform Transfers to Minors

6    Act which is set up very specifically to handle situations

7    where people with a foresight -- who don't have the

8    foresight of Janice Montgomery, Damond's grandmother, who

9    provided that it be -- not be distributed till 21 but be

10   held in trust.  The statute also provides that.

11          This kid had everything for him.  He had a

12   grandmother who looked out for him.  He had the law that

13   looked out for him.  And he had a cop father who was

14   supposed to look out for him.

15          And just the most horrific thing I can imagine as

16   a father or as a son happened.  The father took the money.

17   He did unapologetically.  He did it grotesquely buying

18   motorcycles, traveling to exotic locations in the Caribbean

19   while his son is struggling.  His son who went through and

20   completed high school, who aspired to engineering programs

21   at the University of Maryland and Syracuse.  A father who

22   refused to fill out FAFSA forms.  We know why.  We can infer

23   why, I should say.

24          The young man who says if I can't go to these

25   other schools, I'm going to go to community college but he

02/17/16   H-29

1    can't afford it.  And now he's on the streets.  He's

2    suffering from diagnoses that affect his daily living.  A

3    young man at age 21 without the normal support network

4    should have had, at least what was created for him to give

5    him at least a chance in life.  And that chance was taken

6    from him unapologetically.  You do what you got to do.

7    Here's a hundred bucks.  That's outrageous conduct.

8            Damond is, as you heard, a quiet man.  He's got a

9    certain dignity to him under the most unbelievable

10   circumstances.  And I suspect that he does not demonstrate

11   in this court what he feels.  I think he's probably afraid

12   to demonstrate what he feels.  I think he's afraid of the

13   demons that he's been diagnosed with having.  But human

14   common sense tells us when you look at him, when he looks us

15   in the eye, that this kid has suffered.  He suffered the

16   greatest betrayals a person can suffer.  And he's taken it

17   with a dignity.

18           But you know he hurts inside.  You know he feels

19   anger and pain.  And he's going to feel that the rest of his

20   life.  At age 23, he's got a long way to go.  And that

21   relationship with his father is broken irretrievably.  It

22   was not in good shape to begin with but then it's been

23   crushed.  The one true relationship of support and love that

24   he had was with his grandmother.  And his father took that

25   and destroyed it, destroyed the legacy she created for him.

1          So I think this is a case that calls out for

2   non-economic damages measured by a sense of the pain and the

3   loss, the emotional distress that any human being under

4   these circumstances, and certainly in this case Damond,

5   feels and screams out for punitive damages.

6          Now how does one measure the emotional distress?

7   I don't know.  And, you know, it's one of the trickiest

8   areas of the law.  And you finally find yourself -- not

9   finally.  You do it from time to time.  But you're the fact

10  finder.  Normally, this is left to a jury.  So you're going

11  to have to struggle the way a jury struggles.

12          And I'm not going to really suggest any metrics

13  which is unfair of me.  But I don't know what they are.  You

14  know, is it his 10 -- $10 enough to make the nightmares go

15  away?  Ten dollars a day?  Is $100?  I don't know.  But I

16  submit, Your Honor, that it's not insignificant.  And, you

17  know, I can throw a number out.  Maybe I'll just throw a

18  number out and extemporize this.  You know, do you measure

19  it by the amount that was stolen and double it?  Do you --

20  it's got to be tied to who his person is and what he went

21  through.  So I'm going to leave that to you to the extent

22  that you find it appropriate and warranted.

23          Punitive damages -- this case screams out for

24  punitive damages.  And there, we have a little more

25  guidance.  You know, and I'm just going to read to you

02/17/16    H-31

1    Maryland Pattern Jury Instructions because it tells us all

2    we need to know.

3             "If you find for the plaintiff and award damages"

4    -- well, we have found for the plaintiff by default and we

5    have awarded compensatory damages -- "you may go on to

6    consider whether to make an award for punitive damages.  A

7    claim for punitive damages must be proved by clear and

8    convincing evidence.

9             "An award for punitive damages should be:

10             "(1) In an amount that will deter the defendant

11    and others from similar conduct;

12             "(2) Proportionate to the wrongfulness of the

13    defendant's conduct and the defendant's ability to pay;

14             "(3) But not designed to bankrupt or financially

15    destroy a defendant."

16             Okay.  What will defer the defendant?  Well, he

17    said you do what you got to do.  You sue me.  That didn't

18    deter him.  He assumed he would be held liable for that

19    amount and he did it away.  This is an officer of court.

20    He's in courts every day watching people testify in civil

21    and criminal cases.  So he knew that he was liable and would

22    be liable for stealing that money and that didn't deter him

23    from doing it.

24             What would deter others?  Well, I think the

25    purpose of this is to send a message to him and others.  You

02/17/16   H-32

1   steal money, it's not simply you're going to be ordered to
2   pay that money back.  We need to punish you now.
3           So I would submit, Your Honor, that an amount of
4   at least double what he stole is an amount sufficient to
5   deter the defendant and others from similar conduct.
6           "Proportionate to the wrongfulness of the
7   defendant's conduct".  Well, there's a proportion I can't
8   calculate.  Ten million to one, I think, is proportionate to
9   the wrongfulness.  However, that is not proportionate to the
10  defendant's ability to pay or any other human being's
11  ability to pay.
12          So I think when you combine those two concepts, we
13  have a man who's been a police officer since -- I think that
14  public record indicates is 2001, date of hire.
15          (Pause.)
16          MR. BOURGEOIS:  Yeah.  Since November 2001.  So
17  he's been a police officer for the last 15 years.  He's
18  making roughly $80,000, give or take.  So that's not an
19  insignificant income.  It's certainly be supplemented.
20          So I think a significant amount of money is an
21  appropriate amount.  We're not asking you to bankrupt or
22  financial destroy the defendant.  The defendant has elected
23  not to be here and give us a sense for what would
24  financially destroy him.  But that's not what we're asking
25  the Court to focus on because that's not what we want to do.

1   But we do want an amount to deter the defendant and others

2   from similar conduct and that is proportionate to the

3   wrongfulness of this conduct.

4           And, Your Honor, I would submit, respectfully,

5   that when $75,000 and change was stolen, a crime or at least

6   a tort, to put it gently, that has significantly impacted

7   this young man and will for the rest of his life and

8   particularly vulnerable young man, the amount of punitive

9   damages should be significant.  And I would submit, again,

10  you're going to have to make that hard call.

11          Is there evidence by clear and convincing evidence

12  -- is there clear and convincing evidence of actual malice

13  in this case?  And this is why I wanted to start with the

14  Darcars case.

15          Darcars tells us that we can look at the factual

16  situation, what occurred, and the context in which it

17  occurred, and from those facts alone conclude

18  circumstantially whether the defendant knowingly did what he

19  did with the knowledge that it was actually wrong.  Actual

20  malice.

21          And here we have in one simple -- well, the facts

22  are straightforward.  The evidence is unrebutted but would

23  be unrebuttable.  The evidence of record in this case which

24  includes, by the way, the exhibits that gave rise to the

25  original judgment that this father was appointed by the

1   personal representative as the custodian for this young

2   man's money under the Maryland Uniform Transfers to Minors

3   Act that he accepted that appointment.  He thus received the

4   money and the duties.

5        Maryland Uniform Transfers to Minors Act confirms

6   what he told his son, that this was his son's money not his

7   money.  It confirms -- the Act itself says that money can

8   only be used for this young man.  And contrary to what he

9   told his son, he actually could have touched the money

10  before 21.  He could have used that money to buy him a

11  startup car if, in a parental role, he thought it was

12  appropriate.  He could have used that money to pay for

13  college.  He could have used that money before 21 to house

14  him, to feed him.  But he said no.  But he also knew and he

15  said to his son, this is your money.  You can't touch it

16  before 21; you can't have it before 21.  And then the most

17  stirring evidence of actual malice, knowledge of

18  wrongfulness, is when, on his 21st birthday, he hands his

19  son a hundred bucks and his son says where's the rest of it.

20  It's gone.  You do what you got to do.  You sue me.

21        Interestingly, in Darcars, the evidence of actual

22  malice, when the car dealership took the down payment and

23  the laptop computer and the CDs that were in the back of the

24  repossessed new car, said, ahh, go talk to a lawyer.

25  Probably choicer language than that but that's what was

1    used.  Forget about it.  Go talk to your lawyer.  Knowledge

2    of wrongfulness.

3            So this case, Your Honor -- it's disturbing on so

4    many levels.  So many levels.  And so we would ask the Court

5    to enter a judgment.  We would ask the Court -- I think

6    Justin -- Mr. Redd has prepared an updated interest

7    worksheet.  We haven't marked it as an exhibit because we

8    didn't offer it but --

9            THE COURT:  That's okay.  You can pass it up.

10           I also noted that the clerk incorrectly

11   categorized the damages in my prior order at 67,751 judgment

12   and prejudgment interest of 8,053.  They misread the order.

13           MR. BOURGEOIS:  Oh.

14           THE COURT:  So I need to correct it just

15   generally.

16           MR. BOURGEOIS:  I would appreciate that, Your

17   Honor.

18           So we would ask the Court to recalculate and

19   correct the compensatory damages award.  But we would ask

20   the Court to supplement -- and the Court, we're grateful,

21   left the judgment open so that we could adduce evidence of

22   non-economic and punitive damages.  So we'd ask the Court to

23   make an appropriate award of non-economic damages and an

24   appropriate award of punitive damages in an amount to defer

25   the defendant and others from similar conduct as

1    proportionate to the wrongfulness of the defendant's conduct

2    and the defendant's ability to pay but that is not designed

3    to bankrupt or financially destroy the defendant.

4            And so, the hard work is now yours, Your Honor.

5    But we appreciate and we're very grateful for the

6    opportunity to present this.  I know that Mr. Durant Jr. --

7    this has weighed heavily on him.  It's caused some bumps in

8    the road in his relationship with us but our steadfastness

9    and loyalty to Damond Durant Jr. remain undiminished.  And

10   he was apologetic this morning.  I told him to shut up.  He

11   doesn't know what he's talking about.  We've got his back

12   and we will to the end of this.

13           So thank you, Your Honor.

14           THE COURT:  All right.  Thank you very much.

15           We're going to take a brief recess.

16           THE CLERK:  All rise.

17           MR. BOURGEOIS:  Your Honor, do I have time to run

18   downstairs for a minute?

19           THE COURT:  Yes.

20           MR. BOURGEOIS:  Thank you.

21           (Recessed at 10:21 a.m.; reconvened at 10:42 a.m.)

22           THE CLERK:  All rise.  Court will now resume with

23   the Honorable Jeffrey M. Geller presiding.

24           THE COURT:  All right.  Have a seat, everyone,

25   please.

02/17/16   H-37

1       We are back on the record in the matter of Durant

2   v. Durant, 24C 15 246.  Mr. Durant Jr. is present with

3   counsel.  Mr. Durant Sr. has failed to appear having been

4   given notice of today's hearing, having failed to respond to

5   any process or notices from this Court.

6       Having considered the evidence, first of all, I

7   will say, Mr. Durant, I am sorry that you got to go through

8   this.  I can't even imagine.  I have two sons of my own who

9   are quite a bit younger than you, 13 and 10 years old.  But

10  I agree with your counsel that, you know, the obligation of

11  a father or for any parent is to protect their child or look

12  out for their child.  I cannot imagine stealing from my

13  kids.  It is -- I mean, when I first read the file on paper,

14  it was shocking.  And then to hear it again, it's just

15  heartbreaking.

16      So having already found the compensatory damages

17  and having found the burden has been met with respect to the

18  underlying claims, the Court needs to turn to the damages to

19  be awarded.

20      As I noted before I took the recess, the clerk

21  erroneously entered a judgment -- it shouldn't have been

22  considered final at that point anyway since we had this

23  hearing set.  So the notice of recorded judgment is

24  incorrect both because it shouldn't have been entered yet

25  and because it lists part of the compensatory damages as

1    prejudgment interest.  And, counsel, I thank you for the

2    interest worksheet.  It was helpful in figuring this out.

3         So just to put these reasons on the record, so the

4    total judgment that's being entered for compensatory damage

5    is $75,804.83.  Looking at the non-economic damages, it's --

6    as Mr. Bourgeois said, it's difficult to come up with how

7    much do you compensate somebody for what they've suffered

8    and gone through.  I -- you know, lawyers when they talk to

9    juries, come up with a variety of ways to think about it,

10   calculating it in terms of number of days, months or years

11   suffering.  And looking at your testimony, thinking back at

12   your testimony, you talked about the fact that at age 16,

13   you had first inquired about having some access to the funds

14   so you could have what, you know, a 16-year old might want

15   as they're looking at getting their driver's license.  A

16   car.  Especially if you know you have money that you have

17   inherited and it's available -- it should be available to

18   you.

19        And I reread the language of the will and I looked

20   at Estates and Trusts Article 13-214 which is Powers and

21   Duties of Guardian and Distribution and talking about what

22   types of things can be accessed.  And although your

23   grandmother said you should not have the money if you're not

24   21 yet, it's governed by the Uniform Transfer to Minors Act

25   which does envision the -- that there may be drawn from the

1    principal of the estate as needed for clothing, support,

2    care, protection, welfare and education.  And I think

3    certainly if -- having transportation would fit in there as

4    well as your thoughts on going to college, that you should

5    have had access to that money before turning 21 for your

6    education.  And you didn't.

7         So for me, I look at a seven-year period from

8    which you became aware that you were being denied access to

9    the money and be given this bogus response.

10         So I'm awarding at a rate of $10,000 a year for

11   seven years, so non-economic damages in the amount of

12   $70,000.

13         With respect to punitive damages, Mr. Bourgeois

14   had suggested double the amount of the compensatory damages.

15   I've looked at the conduct of Defendant, Mr. Durant, and I

16   find it to be, as I said at the outset, aside from being

17   heartbreaking to hear that somebody's been treated like

18   this, it's reprehensible.  It's disgusting.  The fact that

19   he made repeated statements to you knowing full well that

20   they were false, that he couldn't touch the money while he

21   was spending it on himself, to me, that clearly shows, by

22   clear and convincing evidence, that there was actual malice,

23   that Mr. Durant Sr. knew exactly what he was doing.  His

24   statement, "when you turn 21" is further evidence that he

25   knew that he had done something wrong.  Certainly shocking

02/17/16   H-40

1    conduct from anyone, especially a police officer.

2            So having considered that conduct and the Exhibits

3    1 and 2 regarding his income, I understand, obviously,

4    there's limits to what can be garnished.  So I do find he

5    would have an ability to pay and that he should be subject

6    to a substantial punitive damage amount to discourage this

7    type of conduct by others.

8            And in many -- as counsel, I'm sure, are aware, in

9    many statutes that seek to dissuade conduct that preys on

10   consumers, that preys on people who are renting apartments,

11   that a common thing that the state legislature does is they

12   include what's called treble damages which is three times.

13   So I'm going to be awarding treble damages in this case,

14   three times the principal amount of 75,804.83.  So the

15   punitive damages will be in the amount of $227,414.49.

16           I am going to vacate the prior judgment that was

17   entered and enter a final judgment today which also affects

18   the calculation of the prejudgment interest which I have now

19   recalculated.

20           So to summarize, in this matter, the judgment for

21   compensatory damages is $75,804.83 plus non-economic damages

22   in the amount of 70,000 plus punitive damages in the amount

23   of 227,414.49.  And assuming my math is correct -- maybe

24   I'll just double check that.

25           (Pause.)

1          THE COURT:  The total judgment is $373,219.32.

2     I've calculated the prejudgment interest at the prejudgment

3     rate and that comes out to $36,014.11.  So it'll be the

4     judgment amount that I've indicated, the prejudgment amount,

5     and then post-judgment interest at the legal rate.

6          MR. BOURGEOIS:  Your Honor, thank you very much.

7     We appreciate your --

8          THE COURT:  Thank you.

9          MR. BOURGEOIS:  -- hearing us.  And I know Mr.

10    Durant, I think, is --

11         THE PLAINTIFF:  Yes.  Thank you, Your Honor.

12         THE COURT:  You're welcome, sir.  Good luck to

13    you.

14         THE PLAINTIFF:  Thank you.

15         THE COURT:  All right.

16         MR. BOURGEOIS:  May we be excused, Your Honor?

17         THE COURT:  Yes.  Can we go off the record,

18    please?

19         MR. BOURGEOIS:  Yes.

20         (At 10:51 a.m., proceedings were adjourned.)

21

22

23

24

25                      -oOo-

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)

CERTIFICATE OF TRANSCRIBER

         I do hereby certify that the proceedings in the
matter of Damond T. Durant Jr. v. Damond T. Durant Sr., case
number 24 C 15 000246, heard in the Circuit Court for
Baltimore City on February 17, 2016, were recorded by means
of electronic sound recording.

         I further certify that, to the best of my
knowledge and belief, page numbers H-1 through H-41
constitute a complete and accurate transcript of the
proceedings as transcribed by me.

         I further certify that I am neither a relative to
nor an employee of any attorney or party herein, and that I
have no interest in the outcome of this case.

         In witness whereof, I have affixed my signature
this 7th day of November, 2017.

_____
Geoffrey L. Hunt

HUNT REPORTING COMPANY
Court Reporting and Litigation Support
Serving Maryland, Washington, and Virginia
410-766-HUNT (4868)
1-800-950-DEPO (3376)